Gregory S. Hathaway, OSB No. 731240
Christopher P. Koback, OSB No. 913408
greg@hathawaylarson.com
chris@hathawaylarson.com
HATHAWAY LARSON LLP
1331 NW Lovejoy Street, Ste. 950
Portland, OR 97209-3280
Telephone: (503) 303-3101
Facsimile:  (503) 205-8406
    Of Attorneys for Plaintiff Valhalla Custom Homes, LLC

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **VALHALLA CUSTOM HOMES LLC**, an Oregon limited liability company,<br><br>                   Plaintiff,<br><br>vs.<br><br>**THE CITY OF PORTLAND**, an Oregon Municipal Corporation; **TED WHEELER**, individually and in his official capacity; **CHLOE EUDALY**, individually and in her official capacity; **CHRIS WARNER**, individually and in his official capacity; **KURT KRUEGER**, individually and in his official capacity; **AMANDA OWINGS**, in her official capacity; and **LEWIS WARDRIP**, in his official capacity,<br><br>               Defendants. | Civil Case No. 3:21-cv-00225-JR<br><br>**DECLARATION OF MARI REDMAN IVES**<br><br>**(In Support of Plaintiff's Response to Defendants' Motions to Dismiss)** |

1

2        I, Mari Redman Ives, being first duly sworn, do depose and say:

3        1.    I am a member of the Oregon State Bar and am employed by Valhalla

4  Custom Homes LLC as its General Counsel.

5        2.    I first learned of the existence of DRP 6.03 when it was cited as the basis

6  for denying the driveway permits Valhalla sought for its attached housing project on Rodney

7  Avenue. I found DRP 6.03 on the internet in December of 2017 using a Google search. In

1  December of 2017, I researched the Portland Policy Documents ("PPD") and did not find DRP

2  6.03.

3        3.      I alerted Ken McGair (a Sr. Deputy City Attorney) to the fact that DRP

4  6.03 was not in the PPD via email on December 11, 2017. I alerted Defendant Kurt Krueger to

5  the same fact in a telephone conversation on December 11, 2017. I alerted Defendants City,

6  Wheeler, Eudaly and Krueger of the same fact in my letter dated January 2, 2018.

7        4.      I again raised the issue of DRP 6.03 not being published in the PPD in my

8  April 13, 2018, letter to the Portland City Council and the City Attorney. I have subsequently

9  researched the PPD on multiple occasions (including July 17, 2021) and have never found DRP

10  6.03 or any other DRP in the PPD.

11       5.      On December 11, 2017, I spoke with Defendant Krueger via telephone in

12  an effort to persuade him to allow the Rodney Project the two driveways it needed in order to

13  access the approved building design. During that conversation, I explained that Valhalla had

14  consulted all published codes and rules relevant to the project and that its architects had as well. I

15  explained that DRP 6.03 was not published anywhere and did not exist at the time Valhalla

16  purchased the property and that no announcement of its subsequent existence was ever made

17  until it was cited as the reason for denying Valhalla's driveway permits. I explained that Valhalla

18  had consulted PBOT staff before purchasing the property. I asked, "Doesn't it make you feel

19  bad, just as a human being, that we had no way of knowing about DRP 6.03 and now it's being

20  used to kill our project?" Mr. Krueger's response was that he did not feel bad because he was the

21  one who had to take phone calls from people angry about not being able to find a parking space.

22       6.      I attached to my declaration as Exhibit A a true and correct copy of my

23  December 11, 2017, email to Ken McGair with a December 12, 2017, response from Mr.

**DECLARATION OF MARI REDMAN IVES**

Hathaway Larson LLP
1331 NW Lovejoy St., Ste. 950
Portland, OR 97209-3280
Telephone: 503-303-3101

1   McGair.

2           7.      I attached to my declaration as Exhibit B a true and correct copy of my

3   January 2, 2018, letter (without enclosures) to Defendants City, Wheeler, Eudaly, Krueger and

4   others.

5           8.      I attached to my declaration as Exhibit C a true and correct copy of my

6   April 13, 2018, letter (without enclosures) to the Portland City Council and the City attorney.

7           *I declare that the above statement is true to the best of my knowledge and belief and I*

8   *understand it is made for use as evidence in court and is subject to penalty for perjury.*

            DATED: July 19, 2021


                                                    _____
                                                    Mari Redman Ives

**Hathaway Larson LLP**
1331 NW Lovejoy St., Ste. 950
Portland, OR 97209-3280
Telephone:  503-303-3101

**mari@valhallacustomhomes.com**

| | |
|---|---|
| **From:** | McGair, Ken <Ken.McGair@portlandoregon.gov> |
| **Sent:** | Tuesday, December 12, 2017 6:46 PM |
| **To:** | Mari Ives |
| **Cc:** | Valhalla Custom Homes |
| **Subject:** | Re: 4163 & 4175 NE Rodney Avenue  TR 17-266885 |

Ms. Ives. I received your voicemail. I think the best thing to do is to set up a time to speak. Will Friday morning work?

Ken McGair | Sr. Deputy City Attorney
PORTLAND OFFICE OF THE CITY ATTORNEY
1221 SW Fourth Avenue, Room 430
Portland, OR 97204
Voice: 503-823-4051 | Fax: 503-823-3089
Ken.Mcgair@portlandoregon.gov

Equal Access Notice: The City of Portland operates without regard to race, color, national origin, religion, sex, sexual orientation, gender identity, marital status, age or disability according to all applicable non-discrimination laws, Title VI of the Civil Rights Act, and Title II of the ADA. To help ensure equal access to City services, the City will provide translation and interpretation and will reasonably modify policies or procedures and provide auxiliary aids or services to persons with disabilities. For such requests please click here or call (503) 823-2559, TTY 503-823-6868 or Oregon Relay Service: 711.
Portland City Attorney Confidentiality Notice: This message may contain confidential or legally privileged information belonging to the sender. If you have received this message by mistake, please immediately notify the sender, delete the original message, and destroy all copies.

Outlook for iOS

**From:** Mari Ives <mari@valhallacustomhomes.com>
**Sent:** Monday, December 11, 2017 11:19:16 AM
**To:** McGair, Ken
**Cc:** Valhalla Custom Homes
**Subject:** 4163 & 4175 NE Rodney Avenue TR 17-266885

Dear Ken:

I spoke with Kurt Krueger this morning regarding a driveway design for a property in the R2.5 zone. The property (a single lot) has 50 feet of frontage and will be the site of an attached, two-unit condominium.

Prior to the purchase of this property in April of 2017, Gary Ives (a member of Valhalla Custom Homes LLC) met with PBOT staff to discuss the driveway design. Based upon information received at that meeting, including drawings made contemporaneously by Gary to illustrate the discussion with PBOT staff (and shared with PBOT staff during that discussion), and review of the City Code (which was consistent with the

1

information conveyed by PBOT staff) Valhalla Custom Homes purchased the property and began the design process for the building.

On May 31, 2017, PBOT implemented new driveway requirements via DRP 6.03 which were inconsistent with the Code and the information provided in the April 2017 meeting with PBOT staff. The new requirement is for shared driveways for all attached housing. The authority cited for this new requirement was Section 17.28.110.C.5. These new requirements increased the minimum setback rules for garages in attached dwellings from 18 feet to 24 feet. The new requirements also changed the length of an on-street parking space from 18 feet to 15 feet.

I know from talking to Andy Jeffrey that these new requirements were not published for some time. I do not know when they were added to the on-line Policy page. To date, the City Code does not reflect any increased setback rules or new parking space dimensions. Nor, does the PPD reflect these new requirements.

Because these new requirements were adopted as policy, PBOT has discretion to allow a driveway design other than that described in DRP 6.03. I have attempted to convince Kurt that the means used to implement these new requirements are not proper because policy cannot be used to change the City Code. And that Valhalla Custom Homes did everything it could to comply with existing Code and information received from staff of PBOT. It would seem that the prudent course of action would be to allow Valhalla the two driveway design based upon the history of this situation while allowing PBOT an opportunity to pursue rule making according to established procedures.

I understand Kurt will be bringing by our file and discussing this with you. I am respectfully requesting an opportunity to discuss this with you further as I have attempted to keep this relatively short and have not raised all of the pertinent legal issues.

Thank you.

Mari Ives
Lead Design/General Counsel  OSB # 002893
Valhalla Custom Homes LLC
503.349.7879
mari@valhallacustomhomes.com





14210 SE Harney Street, Portland, Oregon 97236
home@valhallacustomhomes.com
CCB # 198832

January 2, 2018


Mayor Ted Wheeler
1221 SW Fourth Avenue, Room 340
Portland, OR 97204

Commissioner Dan Saltzman
1221 SW Fourth Avenue, Suite 230
Portland, OR 97204

Commissioner Chloe Eudaly
1221 SW Fourth Avenue, Suite 210
Portland, OR 97204

Director Leah Treat
Portland Bureau of Transportation
1120 SW Fifth Avenue, Suite 800
Portland, OR 97204

Tracey Reeve, City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204


Re:     Development Review Policy 6.03 – Created Without Authority & Via Illegal Process

I am General Counsel for Valhalla Custom Homes, LLC. We are a small, family owned
and operated home builder. Because I am an attorney, I know the difference between just being
treated unfairly and when a governmental agency has lost their bearings when it comes to their
understanding of their duties and powers.  If I were a City employee, I would be a whistle-
blower.

## What Happened

Late March 2017 – Valhalla identifies a 50 foot wide property at 4205 NE Rodney for possible purchase. After review of the Portland City Code (hereinafter "Code"), it is determined that the site is zoned such that an attached two unit dwelling is allowed. Valhalla makes an offer on the property subject to a due diligence period.

Early April 2017 – Valhalla visits the Development Services Center and meets with Planning staff to verify the zoning and the allowed uses. Staff confirms the zoning and allowed uses.

Valhalla then visits the Portland Bureau of Transportation (hereinafter "PBOT") to discuss the driveway design. PBOT staff locates the property and confirms that the only issue to be addressed is on-street parking. PBOT staff confirms that an on-street parking space must be 18 feet. PBOT staff confirms that the minimum allowed shared driveway width for a two unit attached dwelling is 14 feet. Staff confirms that one central driveway to serve two central garages will result in no on-street parking, even if at the minimum width of 14 feet. Valhalla asks about a two driveway design as opposed to a single driveway design. PBOT staff confirms that a Driveway Design Exception Request will have to be filed once a site plan has been prepared. Discussion is had about the possibility of creating an on-street parking space between the two driveways. No discussion of driveway "wings" is had.

Late April 2017 – Valhalla purchases the property.

May 31, 2017 – PBOT (without authority) issues (but does not publish) Development Review Policy 6.03 (hereinafter "DRP 6.03"; copy attached) reducing the required size of on-street parking from 18 feet to 15 feet; increasing the minimum garage setbacks from 18 feet to 24 feet; and mandating that all attached dwellings be designed with the garages located immediately adjacent to one another.

With no knowledge of the May 31, 2017 changes in PBOT policy, Valhalla proceeds to expend significant sums to have a custom design created for the property with the garages on the outside walls of the structure. Valhalla believes in the City's goal of architectural diversity and does not use stock plans.

November 6, 2017 – Kevin Partain of Urban Visions Planning Services prepares and submits a Driveway Design Exception Request on behalf of Valhalla. Unbeknownst to Valhalla, he checks the box for "Waive requirement for shared driveway" in addition to the "Allow more than one driveway per frontage" box. Presumptively, this was done in response to discussion with Bureau Employees.

December 1, 2017 – PBOT denies the Driveway Design Exception Request and requires the building plans be redesigned so as to accommodate the new standards in DRP 6.03.

### The Rule of Law Depends – First – Upon Those in Power Actually Knowing the Law

The triggering event for this letter is a permit issue. However, there is more at stake here than just what might be considered through an appeal process. This is a serious process, policy and failure to understand the law problem that negatively impacts the work of city bureaus, commissions, the City Council and any citizen planning to build in the R3, R2, R1 or R2.5 zones. *I know this letter is long, but I am respectfully requesting that you read it as I am certain you will find the information contained herein eye opening and disturbing. And something you will feel compelled to address and remedy. I am also requesting an opportunity to discuss this with you.*

### Losing Sight of the Big Picture

PBOT has a number of employees, (hereinafter "Bureau Employees"), who have been infected with a Street Parking Virus. This Virus has blinded them to the administrative, statutory and constitutional restraints on their power. They have developed an indifference to the goals of other bureaus, commissions, the City Council, the Mayor and the citizens they serve. For Bureau Employees, only the goals specifically assigned to PBOT enter into the decision making equation – even when it is clear that a given goal has been superceded by City Council action that favors another, larger goal.

### Frustrated with Effects of Attached Housing, Bureau Employees Overstep Their Authority

In reaction to the City Council's decision to promote density by encouraging attached housing in the R3, R2, R1 and R2.5 zones, Bureau Employees have adopted a policy which is at the heart of this problem. Bureau Employees' frustration is with the fact that when two attached dwelling units are sited on a 36 to 56 foot frontage, providing access to two on-site parking spots (as required by the Code) results in no on-street parking along that frontage.

It is a simple mathematical equation. When the City Council approved attached dwelling units on lots with 36 to 56 feet of frontage and required that each dwelling unit have an on-site parking spot it was a given that there would be no on-street parking along that frontage. **The decision was made – other priorities outweighed preserving on-street parking.**

For a time, Bureau Employees accepted this fact and issued driveway permits in widths consistent with the standards in Section 17.28.110.C.1 (copy attached) of the Code and located along the frontage at whichever point or points aligned with the location of the garages. That is – until they didn't. Instead, Bureau Employees have determined that on-street parking should not

City of Portland
January 2, 2018
Page 4

have been the loser in the equation.

If Bureau Employees believe that the City Council ought to revisit its decision to allow for this increased density because it decreases on-street parking (even though the Code provides for adequate on-site parking to accommodate the needs generated by the dwelling unit), then they could have proposed that the City Council change the Code. However, instead of taking that route, Bureau Employees decided that they had unilateral authority to do so internally.

Bureau Employees determined that what should have been sacrificed in the equation were other purposes enumerated in the Code. Bureau Employees decided that they could regain on-street parking if a number of policies and rules in the Code which were standing in the way – many of which do not affect transportation – were revised, reinterpreted or ignored.

**Without any Legal Basis or Authority, Bureau Employees Create DRP 6.03 –
A Shadow Code Available Only Directly From PBOT**

On May 31, 2017, Lewis Wardrip, City Traffic Engineer, and Kurt Krueger, Development Review Division Manager, issued DRP 6.03 which purported to establish new requirements and standards for all driveways serving attached housing in the R3, R2, R1 and R2.5 zones. The cited authority for the new standards and requirements was Section 17.28.110.C.5 of the Code. The authority granted in this Section is misrepresented and overstated in DRP 6.03. Specifically, Section 17.28.110.C.5:

- Does not give PBOT authority to require joint or shared use of a driveway when there is one property in single ownership (as in Valhalla's case)

- Does not give PBOT authority to redefine "property" to mean dwelling

- Does not give PBOT authority to redefine the size of a parking space

- Does not give PBOT authority to redefine preserving on-street parking to include combining space with abutting properties

- Does not give PBOT authority to change the minimum garage setback rules, which are part of Title 33

- Does not give PBOT authority to set design standards for attached housing

- Does not include a delegation of authority to adopt binding requirements, regulations or procedures

City of Portland
January 2, 2018
Page 5

This new policy was not published in the Portland Policy Documents (hereinafter "PPD"). It is therefore null and void as an administrative rule, binding requirement, regulation or procedure pursuant to Section 1.07.080 of the Code.

## Bureau Employees Assert Process Does Not Matter

Bureau Employees assert that because the power to impose conditions is granted in several subsections of Section 17.28.110 of the Code, PBOT may create rules and regulations and set public policy (even when contrary to rules and policy articulated in the Code) without any specific grant of rule making authority from the City Council and without complying with the rule making process. Bureau Employees claim their "authority is broad" and allows PBOT to impose the conditions contained in DRP 6.03 even if DRP 6.03 was not validly implemented under due authority.

**The argument appears to be that DRP 6.03 is not a real policy or rule, it is just a set of standard conditions that PBOT is going to impose broadly on all attached dwelling units in four residential zones.** That is a word game no court will tolerate. ORS 183.310(9) provides the definition of "rule" which, absent a different definition in the City's Charter or Code, is the accepted definition of "rule" in Oregon courts. *McCleery v. State By & Through Oregon Bd. Of Chiropractic Examiners,* 132 Or App 14 (1994). ( Providing further clarification of the definition, and determining that "policy statement is a rule.")

Obviously, Section 1.07.080 was designed to let bureaus know that if they didn't publish in the PPD, they couldn't enforce what should have been published. Here, PBOT likely couldn't have published in the PPD, because PBOT was not authorized to create any administrative rule, binding requirement, regulation or procedure based upon Section 17.28.110. To then assert that such lack of authority actually puts PBOT in a stronger position to enforce their rule because they can pretend it's not a rule is exactly what the authority in the preceding paragraph says will not be tolerated.

Bureau Employees appear to conflate the authority to respond to individual, unique situations by imposing conditions consistent with the Code with an authority to legislate what they think the Code ought to be. This is evident in DRP 6.03 where Bureau Employees take a rule applicable only to "two properties in separate ownership" and assert that all of the authority given in that circumstance also applies any time there are going to be two dwelling units, even though the property is one lot and is owned by one owner.

## DRP 6.03 Imposes Requirements in Conflict with the Code

The standards set forth in DRP 6.03 change the minimum setbacks for all attached housing on frontages (or combined frontages) between 36 and 56 feet wide in four residential

zones. **DRP 6.03 replaces the 18 foot minimum garage setback set forth in Title 33 with a 24 foot minimum garage setback.** This is not just a "condition" being applied to an individual permit application; this is an unpublished, illegitimate, revision to the Code. (It's quite a stretch to say authority to set the width and location of a driveway implies authority to control the location of the building.) The need for proper process is dramatically illustrated by the fact that in three of the zones, certain properties have a 20 foot maximum setback pursuant to Section 33.120.220. **Therefore, DRP 6.03 mandates a minimum setback of 24 feet at the same time that the actual Code requires a maximum setback of 20 feet.**

**The standards set forth in DRP 6.03 reduce the length of a parking space from 18 feet to 15 feet.** It is important to note here that prior to May 31, 2017, all references in the Code and conversations with PBOT staff supported the fact that a parking space was 18 feet in length in order to accommodate a standard passenger vehicle which ranges from 15.4 to 16.4 feet in length. Compact cars average 13.5 feet in length.

Only by redefining a parking space, could Bureau Employees claim that the new rules and standards "preserve on-street parking."

This is the basis on which Bureau Employees claim authority to regulate not only the setback requirements but also the design of the building. Without redefining a parking space by shortening it by 3 feet, there is nothing to be gained by imposing the other conditions.

**DRP 6.03 mandates that all attached housing in four residential zones shall have garages at the center of the building.** Either Bureau Employees are not familiar with the multiple purposes of the setback requirements that exist in the Code, or they have made the unilateral determination that their priority of creating on-street compact car parking trumps any conflicting goals articulated in the Code. Among those goals is, "adequate flexibility to site a building so that it may be compatible with the neighborhood, fit the topography of the site, allow for required outdoor areas, **and allow for architectural diversity**; . . ." Sections 33.110.220 and 33.120.220.

By imposing unpublished, standard, universal conditions for these properties, DRP 6.03 also is in conflict with a key policy of the Code as articulated in Section 33.110.010.B. That is, **"the regulations provide certainty to property owners, developers, and neighbors about the limits of what is allowed."** Nothing in the Code provides that PBOT has authority to change the setback rules and place design standards on the properties in question. **Citizens should be entitled to rely on the worthy and plainly stated promise of Title 33.**

To the extent Bureau Employees believe that PBOT's authority to impose conditions on individual applications can be expanded to create a broad, generally applicable set of standards with the same force and effect as any administrative rule, binding requirement, regulation or

procedure, I respectfully submit that attempt is a violation of Section 1.03.050.

### Bureau Employees Assert Reliance on Publicly Available Rules is Irresponsible

The "it's a rule, but it's not really a rule" argument makes a mockery of democracy. It in effect says there is a giant loophole whereby PBOT can control more than just driveways; it can control what is built with standards that are not published anywhere and are only reliably available if one pays to go through the early assistance process. I was, in fact, told by a Bureau Employee that spending money to design a project in reliance upon the Code, the PPD, precedent, and in person conversation with PBOT was "irresponsible." Only by paying a fee and going through the early assistance process could one know what PBOT would allow.

Given Bureau Employees' expansive reading of their authority, it is consistent with that thinking for them to insist that only through the early assistance process can an applicant have any certainty as to what will be allowed. No matter how standard the property.

Valhalla has a standard 50 foot city lot frontage, on a straight, flat, local service street, not near an intersection, with a building plan that meets the zoning requirements, and that satisfies the City's goal of increased density by providing two dwelling units. Nothing in the Code, nothing in previous (prior to denial) conversation with PBOT staff and certainly nothing in past practice (no street parking at all in front of attached dwellings on a 50 foot frontage) would provide any hint that PBOT would set a standard for driveway design that increased the building setback requirements, reduced the allowed building size and mandated design elements of the building.

Using the logic above, and taken to the extreme, if PBOT can mandate building design features, and setback requirements all just to preserve on-street parking, why can't they insist on the condition that a single family home be constructed instead of attached housing? That would preserve on-street parking. If PBOT has design and setback authority, should the permit process start with driveway design? At some point, Bureau Employees need to concede that the location and width of a driveway is not the factor that should trump other, competing goals articulated by a superior authority – the City Council.

The suggestion that every single project should require a paid, written opinion as to the width and location of a driveway seems inconsistent not just with open government but with efficient government. At some point a project should be standard enough that an early assistance process is not warranted.

### Hurting Citizens and Undermining the Work of Governmental Bodies

Now, even if Bureau Employees may have been persuaded that the new rules are null and

void, they insist they may simply recast them as conditions; thereby rendering the custom designed (and extremely attractive) building plans Valhalla had designed (to address all of the other properly legislated goals and rules articulated in the Code) useless. All to create street parking the City Council was clearly willing to forego in favor of those other priorities. And, Bureau Employees do so with not the least bit of sympathy. It is clear that Bureau Employees have determined that equity is not a factor to be considered in their discretionary decisions. It is also clear that the non-PBOT goals articulated in the Code are not factors they consider. Developers deal with multiple bureaus in obtaining building permits, it is difficult enough without Bureau Employees disregarding and overruling the clearly stated, published goals and rules of other bureaus.

The reality is Bureau Employees are focusing on one goal: preservation of on-street parking. It is obvious that in that single minded pursuit they have either failed to take into account how their mandated building and driveway design otherwise impacts the property or they have decided they don't care. Shortening the available buildable depth of a lot by 6 feet is not a small thing – especially in a high density situation. Doing so will reduce the available living space in a three story 18 foot wide dwelling unit by more than 300 square feet. Mandating that all attached dwellings have their garages immediately adjacent to one another stifles architectural diversity and seriously limits interior layout – which is already challenging in a narrow footprint.

The bottom line is that the City Council weighed all of the relevant and important factors when they adopted the provisions of the Code – including transportation. Theirs was not a one note, single issue mission. It is impossible to imagine that after creating a balanced whole, that it was anyone's intention that setback and design rules would be modified by Bureau Employees with no delegated rule making authority.

### This is Not Only an Individual Project Problem

The May 31, 2017 DRP 6.03 was issued approximately 54 days after Valhalla spoke with PBOT staff, reviewed the Code and surveyed the neighborhood for precedent. Months later, our architects performed their own review of the Code and PPD and, of course, found nothing about DRP 6.03. The existence of DRP 6.03 became known to us only after it was cited as the basis for our denial.

As consequential as PBOT's decision is in Valhalla's situation, consider the fate of the owner of a 50 foot deep lot in the R2.5 zone desiring to build attached housing. On a 50 foot deep lot, it will be impossible to achieve the required 10 x 10 foot outdoor area because a 24 foot setback + an 18 foot parking area + a 10 foot outdoor area = 52 feet. Two feet short of compliance.

With more time, and an even longer letter, I expect there are many other examples of how the increased setback will create ripple effects not considered by Bureau Employees.

This is also not only an individual project problem because if Bureau Employees have not created a new rule as to what constitutes "on-street parking," then they must believe they can vary the definition of what constitutes "on-street parking" on a case by case basis.

A grant of authority to vary the definition depending upon the zoning or other factors would need to be overtly delegated and would become part of the Code.

**There is a fundamental difference between imposing conditions so as to cause a given property's driveway width and location to meet consistent goals and standards and changing those goals and standards on a case by case basis.**

Bureau Employees invite us to let them "point [us] in the direction of the appeals process." That may well solve Valhalla's problem for this one project. But, this will be an ongoing problem for everyone going forward if the Bureau Employees are not educated as to why they cannot exceed the authority given them by the City Council. And if they are not educated as to how to read their own enabling statutes.

### A Misunderstanding of Procedural Law

Bureau Employees believe that the language in Section 17.28.110 of the Code, Driveways – Permits and Conditions, gives PBOT legislative and regulatory powers which are superior to those of the City Council. What the City Council can only do following proper legislative procedures, Bureau Employees assert they can do via internal memorandum.

When that premise is challenged, the retort is that if the rules are invalid, it doesn't matter because the power to impose conditions is absolute and PBOT does not need rules or policies – it can do whatever it wants as long as it is in furtherance of one of its assigned goals. In this case, the goal of preserving on-street parking. This requires a belief that the City Council could (and would) transfer rights to PBOT which the City Council itself does not possess. That is, the right to legislate in secret, and the right to have policies and standards which are broadly applied to the public but which are not subject to the usual rules regarding their creation, publication or application.

It also betrays the truth that Bureau Employees are not imposing conditions in response to recommendations from the City Traffic Engineer after referral of an individual driveway permit application. (The antecedent to triggering those recommendations.)

No grant of legislative powers has been made to PBOT with regard to Section 17.28.110

City of Portland
January 2, 2018
Page 10

or any subsection therein. When the City Council has desired to grant legislative powers to PBOT it has done so with clear and plain language. For example, with regard to a Bicycle Parking Fund, Section 17.28.065.C.1 states, "The City Council delegates authority to the Director of the Bureau of Transportation to adopt administrative rules and procedures necessary to implement provisions of this section. All rules pursuant to this authority shall be filed with the Office of City Auditor and be available for public inspection."

No such language exists in Section 17.28.110. Even the clear grant of authority in Section 17.28.065.C.1 is limited to " rules and procedures necessary to implement provisions of this section." In contrast, PBOT reads the power to impose conditions in Section 17.28.110 as the exception which swallows all of the other provisions of Section 17.28.110.

This is the tricky part. Rather than reading the provisions of Section 17.28.110 as the standard to be applied unless a distinct, individual circumstance makes it necessary to modify the width of a driveway to something more than the allowed minimum or less than the allowed maximum, or the location to other than that requested by a specific applicant, PBOT reads the standards as limitations on the public only – not standards that the public can rely on absent unique circumstances.

Thus is born the belief by Bureau Employees that PBOT can do anything it wants. A sentiment that was confirmed to me personally in conversations with three Bureau Employees.

## The Rules of Statutory Construction Applied to 17.28.110

These Bureau Employees do not seem to understand and/or feel bound by the basic rules of statutory construction. Some of the most relevant follow (numbers are for ease of reference going forward):

1. The literal words of a statute must be given their plain, usual, and ordinary meaning

2. The statute must be construed as a whole

3. For a statute to be ambiguous there must be more than one reasonable interpretation

4. If the statute is ambiguous, intent is determined not only by the literal words of the statute, but also the reasonableness of proposed constructions, the public policy behind the statute and its legislative history

5. Statutes should be given a reasonable and practical interpretation in accord with common sense

6. Where general words follow the enumeration of a particular class of persons or things, the general words will be construed as applying only to things of the nature enumerated

7. Constructions that would lead to absurd or unreasonably harsh results are disfavored

8. In determining the ordinary meaning of a statute effect must be given to all the words of the statute if possible, so that none will be void, superfluous, or redundant

9. Words used in one place in a statute usually have the same meaning in every other place in the statute

10. When construing two separate statutes that deal with the same subject matter, the statutes should be construed harmoniously, if at all possible, so as to further the legislative intent

11. Statutes granting privileges or relinquishing rights are to be strictly construed

Bureau Employees' understanding of the extent of its power requires that every single one of the above, well accepted, universally recognized, principles be ignored. It also requires ignoring the language of the Code which says, "the regulations provide certainty to property owners, developers, and neighbors about the limits of what is allowed."

Bureau Employees read everything in Section 17.28.110, other than the authority to impose conditions, as surplusage. They disregard the fact that the Code describes the specific situations under which that authority arises and instead operate under the premise that the authority exists as an absolute, untethered from the plain language of the Code. Under this reading, the standards articulated in the Code (even standards in Title 33) can offer no certainty because Bureau Employees claim power to impose conditions even when they conflict with other Code provisions outside of PBOT's jurisdiction. **This violates principles # 1, 2, 5, 6, 7, 8 & 10**.

In Section 17.28.110.C.5, PBOT is granted authority to "require joint or shared use of a driveway by two properties in separate ownership." Bureau Employees disregard the language "by two properties in separate ownership" and announce via an internal memorandum that PBOT has "authority to require shared use of a driveway by two dwelling units. . ." See, DRP 6.03. **This violates principles # 1, 6, 8 & 9.**

If PBOT defines "property" as "dwelling unit" in Section 17.28.110.C.5, then it is abandoning the right to require shared use of a driveway in a commercial application. **This violates principles # 1 & 7.**

When it is pointed out to PBOT counsel that Valhalla's situation does not involve "two properties in separate ownership" but rather attached housing on one lot (future condominiums),

City of Portland
January 2, 2018
Page 12

the response is that it is of no matter because the second sentence in Section 17.28.110.C.5 gives PBOT authority to "establish conditions . . . to . . . preserve on-street parking." The antecedent sentence establishing the subject of the subsection is ignored. **This violates principles # 6 & 8.**

Section 17.28.110.D provides that "The Director of the Bureau of Transportation **may refer any driveway permit application** to the City Traffic Engineer . . . for review of the location and width. The City Traffic Engineer shall recommend such conditions and limitations regarding the location and operation of driveways as are found necessary to . . . preserve on-street parking." The foregoing language is not authorization to create a policy, rule or standard. It is very plainly the option to have the Traffic Engineer **look at the specific circumstances of an individual permit application** and make recommendations. Using this as authority to create a policy, rule or standard **violates principles # 1, 2, 3, 4, 5, and 6.**

### Defining a Unicorn

Valhalla's driveway permit application was denied on the basis that "shared driveways are required with attached housing." Under Reasons, Comments, & Conditions it reads: "Condition: The attached housing units shall share a 14-foot driveway per DRP 6.03." Very clearly, PBOT cited a policy, rule or standard of general applicability to all attached housing which was the basis for the denial.

However, I expect that Bureau Employees will argue that, in the alternative, the conditions were imposed in consideration of the specific features of Valhalla's property. I also expect that the record will show that Valhalla's Driveway Design Exception Request Form was not referred to the City Traffic Engineer and that no one visited the site to evaluate the specific characteristics of the site.

In a subsequent email regarding the decision "to stand with their decision regarding the original shared driveway condition," the rationale given without reference to DRP 6.03 was, "The area has a high parking demand." I do not have access to a definition for "high parking demand." However, I can report that in all of the visits we have made to the property since April of 2017, we have never had any problem finding on-street parking. This is true even though a fair number of cars seem to rarely move from their on-street parking spot and a fair number of attached dwelling units are present. A quick look at Google Earth, Portland Maps or a drive out to the site will verify this fact.

It would seem that if 4205 NE Rodney Avenue qualifies as an " area [that] has a high parking demand," it is very unlikely that any of the areas within the R3, R2, R1 and R2.5 zones would not also be deemed areas with a high parking demand. If the conditions being imposed on Valhalla's project are not in response to a null and void rule, then I would like to know under what conditions PBOT would find that attached dwelling units on a 50 foot wide frontage would

City of Portland
January 2, 2018
Page 13

not be required to use the shared driveway design illustrated in Figure 1 of DRP 6.03. Does that unicorn exist?

There is a true and significant conflict between the actions taken by Bureau Employees and the law. I respectfully submit that this conflict is clear enough that action to correct it should be taken immediately.

I look forward to talking with you.

Very truly yours,

Mari Redman Ives, OSB # 002893
Valhalla Custom Homes, LLC

Mobile (503) 349-7879
E-Mail: mari@valhallacustomhomes.com

cc:    Ken McGair
       Kurt Krueger
       Andy Jeffrey

EXHIBIT C



14210 SE Harney Street, Portland, Oregon 97236
home@valhallacustomhomes.com
CCB # 198832

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

April 13, 2018

Portland City Council
1221 SW Fourth Avenue, Room 130
Portland, OR 97204

Tracy Reeve, City Attorney
1221 SW Fourth Avenue, Room 430
Portland, OR 97204

### Notice of Intent to Request Enforcement Order

This is notice that Valhalla Custom Homes LLC intends to petition the Land Conservation and Development Commission for an enforcement order pursuant to ORS 197.319 to 197.335, in particular ORS 197.320(10), to require the City of Portland to comply with ORS 197.307(4) if the City does not, within 60 days of today's mailing (April 13, 2018), take the following actions:

### Requested Corrective Actions

1. With the exception of the Central City Plan District and regional centers defined by Metro, the City of Portland must limit the standards, conditions and procedures for approval of development permits for needed housing (as defined in ORS 197.303(1)) to only those clear and objective standards, conditions and procedures which are clear and objective on the face of ordinances duly enacted by the Portland City Council.

2. Advise and instruct the Portland Bureau of Transportation (hereinafter " PBOT") that the standards and requirements in Development Review Policy 6.03 (hereinafter "DRP 6.03") cannot be imposed as conditions of approval for the issuance of driveway permits.

3. Issue the driveway permits as requested by Valhalla Custom Homes LLC for property located at 4205 NE Rodney Avenue and subsequently identified as 4163 & 4175 NE Rodney Avenue. The permit application numbers are: 17-242683-000-00-RS and17-242705-000-00-RS.

EXHIBIT C

### Why This Action is Being Requested

The City of Portland, by and through the actions of PBOT, is imposing approval standards, special conditions on approval of specific development proposals and employing decision making processes relative to the issuance of development permits for needed housing that do not comply with ORS 197.307(4). *Exhibit 1.*

Attached as *Exhibit 2* is DRP 6.03. This internal memorandum contains standards and requirements which are being applied as conditions of approval for issuance of driveway permits to service all attached housing in the R3, R2, R1 and R2.5 zones. The application of these standards and requirements violates ORS 197.307(4).

In response to the argument that the approval or denial of a driveway permit application is not a land use decision or limited land use decision, the Oregon Land Use Board of Appeals responded:

"We might be inclined to agree with the city if the decision solely involved driveways outside the context of the related development. The driveway variance, however, is inextricably linked with the ... development proposed for the property... the driveways were not considered in a vacuum; rather they were considered as part of the proposed development." *Delk v. City of Salem,* __ Or LUBA __. (LUBA No. 2005-064, January 25, 2005).

### The Legal Framework for Need Housing Approval Standards

"Needed housing" means all housing on land zoned for residential use or mixed residential and commercial use that is determined to meet the need shown for housing within an urban growth boundary. . ." ORS 197.303(1). *Exhibit 3.*

Future references in this notice to "needed housing" are meant to exclude housing within the Central City Plan District and regional centers as defined by Metro. Valhalla's application is for needed housing.

### 1.    Clear and Objective on the Face of an Ordinance

With the exception of the Central City Plan District and certain regional centers, "A local government may adopt and apply only clear and objective standards, conditions and procedures regulating the development of housing . . ." *ORS 197.307(4).*

"Approval or denial of a discretionary permit application shall be based on standards and

criteria, which shall be set forth in the development ordinance and which shall relate approval or denial of a discretionary permit application to the development ordinance and to the comprehensive plan for the area in which the development would occur and to the development ordinance and comprehensive plan for the city as a whole." *ORS 227.173(1). Exhibit 3.*

"When an ordinance establishing approval standards is required under ORS 197.307 to provide only clear and objective standards, the standards must be clear and objective on the face of the ordinance." *ORS 227.173(2). Exhibit 3.*

All legislative acts relating to comprehensive plans, land use planning or zoning adopted by a city shall be by ordinance. *ORS 227.186(2). Exhibit 3.*

### 2.  Public Hearing Required to Amend or Change

"All land-use plans and implementation ordinances shall be adopted by the governing body after public hearing . . ." *OAR 660-015-0000(2). Exhibit 3.*

### 3.  Advance Notice Required

"At least 20 days but not more than 40 days before the date of the first hearing on an ordinance that proposes to rezone property, a city shall cause a written individual notice of a land use change to be mailed to the owner of each lot or parcel of property that the ordinance proposes to rezone." *ORS 227.186 (4). Exhibit 3.*

" For purposes of this section, property is rezoned when the city: . . . (b) Adopts or amends an ordinance in a manner that limits or prohibits land uses previously allowed in the affected zone." *ORS 227.186 (9). Exhibit 3.*

"Before a local government adopts a change, including additions and deletions, to an acknowledged comprehensive plan or land use regulation, the local government shall submit the proposed change to the Director of the Department of Land Conservation and Development . . . at least 20 days before the local government holds the first evidentiary hearing on adoption of the proposed change." *ORS 197.610(1). Exhibit 3.*

### 4.  Limits on Authority to Delegate

"All land-use plans and implementation ordinances shall be adopted by the governing body after public hearing . . ." *OAR 660-015-0000(2). Exhibit 3.*

Only the Portland City Council can pass an ordinance regulating the development of housing in Portland. Only the Portland City Council can legislate standards, requirements and approval standards for needed housing.

If the City Council delegates authority to the Director of the Bureau of Transportation to adopt administrative rules and procedures necessary to implement provisions of an ordinance, all such rules must be published in the Portland Policy Documents ("PPD") to be effective. *Portland City Code (hereinafter "PCC") 1.07.060. Exhibit 3.*

"Administrative rule" means binding requirements, regulations or procedures that are formally adopted by the City Council or a City official pursuant to rule-making authority expressly delegated by the Council. Administrative rule making authority must be adopted by Binding Resolution or Ordinance. An administrative rule adopted after October 26, 2001 must state in its text that it is an "Administrative Rule." *PCC 1.07.020. Exhibit 3.*

No express rule-making authority was delegated by the City Council to the Director of the Bureau of Transportation to establish the standards and requirements contained in DRP 6.03. The standards and requirements in DRP 6.03 have not been formally adopted. Neither the rules or procedures contained in DRP 6.03, nor DRP 6.03 itself, have been published in the PPD.

**None of the above-referenced, legally required, standards and procedures were followed when the new standards and requirements contained in DRP 6.03 were created.**

**The new standards and requirements in DRP 6.03 limit or prohibit land uses previously allowed in the R3, R2, R1 and R2.5 zones.**

**The new standards and requirements were not enacted by ordinance. The new standards and requirements do not appear on the face of any ordinance.**

**Nevertheless, they are being applied as new binding requirements and approval standards applicable to all attached housing across four residential zones.**

### The Facts

Valhalla Custom Homes LLC has a development permit pending for an attached needed housing project at 4163 and 4175 NE Rodney Avenue. This is a Type 1 administrative procedure to be made under clear, objective and non-discretionary criteria.

EXHIBIT C

Valhalla has a second property at 736 NE Sumner on which it also intends to construct two side-by-side attached needed housing units. DRP 6.03 would even more severely impact the Sumner property as it is more shallow. Valhalla has not applied for permits (other than demolition) because Valhalla wishes to avoid the application of DRP 6.03 standards and requirements.

With regard to Valhalla's permit application for 4163 and 4175 NE Rodney Avenue, PBOT has conditioned approval of Valhalla's driveway permits on compliance with the standards and criteria in DRP 6.03. These standards and criteria are not contained in any ordinance and do not implement any clear and objective standards contained in any ordinance.

The new and additional criteria require that Valhalla:

1. Site its garage entrances at least 24 feet back from the front property line even though PPC 33.110.220, Table 110-3, clearly and objectively sets a minimum garage entrance setback of 18 feet,

2. Redesign its building so as to locate the garages immediately adjacent to each other,

3. Use a shared driveway to access the two required parking spaces on its property.

A copy of the denial, and correspondence with a Sr. Deputy City Attorney is attached as *Exhibit 4.*

The PBOT imposition of new standards and requirements not found on the face of any ordinance renders the proposed building (approved by Planning and Zoning) incapable of receiving a building permit because its design does not, and is not capable of, meeting PBOT's new design requirements.

**PBOT's Conditions of Approval Do Not Comply with ORS 197.307(4)**

**No Clear and Objective Standards for Preservation of On-Street Parking**

PBOT recites the intent of DRP 6.03 to be the preservation of on-street parking.

1. **There is no ordinance** which makes the preservation of on-street parking a requirement or condition of approval for needed housing outside of the Central City Plan District and regional centers defined by Metro.

2.   **There is no ordinance** which establishes a standard for what it means to "preserve on-street parking" for needed housing outside of the Central City Plan District and regional centers defined by Metro. (Such as length of space, how preservation is quantified.)

3.   The ordinances that do exist regarding parking space size are for on-site parking and are found in PCC Chapter 33.266. The only reference to parallel parking is found in Table 266-4 in which the minimum required curb length for parallel parking is "22 ft. 6 in." The intent of DRP 6.03 is to preserve a 15 foot curb length.

### PCC 17.28.110.C.5 Does Not Contain Standards Regulating On-Street Parking

PBOT cites PCC 17.28.110.C.5 ( *Exhibit 3*) as the ordinance which gives it the authority to "require shared use of a driveway . . . in an effort to preserve on-street parking, . ." *DRP 6.03.*

In order for PCC 17.28.110.C.5 to be applicable to needed housing, it must either contain clear and objective standards which define what it means to "preserve on-street parking" and clear and objective standards which define where, when and how the preservation of on-street parking is required or it must relate to an ordinance which contains those clear and objective standards. It does neither.

In a case regarding the issuance of a residential building permit in Portland, the Court of Appeals responded to the argument that the issue at hand involved an action that did not require interpretation or the exercise of policy or legal judgment or was made under clear and objective standards as defined in ORS 197.015(10)(b)(A) or (B) as follows:

"We emphasize that our inquiry here is not to determine what the relevant terms in fact mean but only to determine whether they can plausibly be interpreted in more than one way. If so, they are ambiguous, and it would follow that the relevant city provisions are not "clear and objective," ORS 197.015(10)(b)(B), and that they cannot be applied without interpretation, ORS 197.015(10)(b)(A); . . ." *Tirumali v. City of Portland*, 169 Or App 241 (2000).

PBOT reads PCC 17.28.110.C.5 through the lens of "discretion" and "broad authority" and therefore, is not looking for clear and objective standards in other ordinances but rather for opportunity to interpret the ordinance as granting PBOT authority to exercise policy judgments. That it did so in DRP 6.03 is clear.

### Reading PCC 17.28.110.C.5 in a Vacuum

EXHIBIT C

PBOT reads PCC 17.28.110.C.5 as giving PBOT authority to make a subjective judgment as to when it is "necessary" to preserve on-street parking. This point is made in DRP 6.03 and in correspondence with the Sr. Deputy City Attorney. *Exhibits 2 and 4.*

PBOT misunderstands the language in PCC 17.28.110.C.5 as delegating to it legislative authority because it reads the ordinance as if it existed in a vacuum. PBOT appears not to recognize that other ordinances are the source of the standards and conditions that determine when, where and if the circumstances following the words "necessary to ensure" will apply to any given property. If those circumstances do apply to a given property, then PBOT "may establish conditions regarding the number, configuration, and use of driveways necessary to ensure . . ." that those circumstances are enabled.

PCC 17.28.110.C.5 contains the word "may" not to convey a subjective choice by PBOT, but rather to acknowledge and allow for implementation of the range of standards which apply in various zones. The latter view is supported by reference to the Comprehensive Plans.

Instead:

PBOT reads PCC 17.28.110.C.5 as giving PBOT authority to make a subjective judgment as to how much curb length is needed to "preserve on-street parking."

PBOT reads PCC 17.28.110.C.5 as giving PBOT authority to make subjective judgments as to where and how on-street parking should be preserved.

PBOT reads PCC 17.28.110.C.5 as giving PBOT authority to impose conditions other than, and in addition to, "the number, configuration, and use of driveways" if it deems additional conditions are necessary to preserve on-street parking. (Building setback and design.)

PBOT reads PCC 17.28.110.C.5 as applying to attached dwelling units on a single lot. (An interpretation of "properties" inconsistent with its meaning elsewhere in PCC 17.28.110.)

If PCC 17.28.110.C.5 is interpreted to give PBOT authority to make subjective judgments regarding on-street parking requirements, then PCC 17.28.110.C.5 is not clear and objective and does not comply with ORS 197.307(4) and ORS 227.173(2), and cannot be applied to needed housing.

PCC 17.28.110.C.5 cannot be read as **both** subjective **and** applicable to needed housing.

**On-Street Parking in the Comprehensive Plan**

EXHIBIT C

The Comprehensive Plan in effect when DRP 6.03 was written lists four objectives for on-street parking management in Goal 6.26.

"Objective A" relates to regional centers, town centers and main streets;

"Objective C" relates to commercial districts;

"Objective D" relates to parking meter districts.

"Objective B" (relative to the issue at hand) states:

"Maintain existing on-street parking in older neighborhoods and commercial areas **where off-street parking is inadequate**, except where parking removal is necessary to accommodate alternatives to the automobile."

Valhalla's property on NE Rodney Avenue is required to have off-street (on-site) parking. Furthermore, the on-site parking required, and provided for in Valhalla's application, and approved by Planning and Zoning is, by definition, adequate. PCC 33.266.110 states, "The purpose of required parking spaces is to provide enough on-site parking to accommodate the majority of traffic generated by the range of uses which might locate at the site over time."

The new 2035 Comprehensive Plan which was adopted on June 15, 2016 to take effect May 24, 2018 states the following in Policy 9.56:

**"Recognize that the curb zone is a public space, a physical and spatial asset that has value and cost. Evaluate whether, when, and where parking is the highest and best use of this public space in support of broad City policy goals and local land use context."**

Nothing in either of the foregoing goals or policy statements supports a reading of 17.28.110.C.5 as containing clear and objective standards requiring the preservation of on-street parking relative to a needed housing development which has adequate on-site parking.

### No Authority for Increased Garage Entrance Setbacks

**There is no ordinance** which grants PBOT authority to change the setback requirements which are clearly and objectively stated in PCC 33.110.220, Table 110-3. PBOT cannot impose an increased setback requirement for needed housing without violating ORS 197.307(4).

## No Authority for Requiring Shared Driveways

As DRP 6.03 clearly illustrates, there is no means by which a 14 foot wide shared driveway can be used for attached housing on frontages between 36 and 56 feet in length without increasing the garage entrance setback requirement. In many cases, this increased setback would reduce the building footprint to less than the allowed lot coverage. In the case of a 50 foot deep lot, it would make it impossible to meet other setback, parking and outdoor space requirements. **There is no ordinance** which requires that all attached dwelling units use a shared driveway.

If PCC 17.28.110.C.5 is to be read as being clear and objective, it can only require joint or shared use of a driveway when there are "two properties in separate ownership" and when there are clear and objective standards on the face of other ordinances that define when, where and how the objectives cited in PCC 17.28.110.C.5 are applicable.

Valhalla's permit application is for attached dwellings on one property, owned by one entity.

## No Authority for Creating Building Design Standards

When the City Council passed legislation allowing (and encouraging) two unit, side-by-side attached housing, it also mandated that each unit have its own on-site parking space. It passed legislation creating the setback requirements for garages for attached housing.

If the City Council had intended to restrict the design of all attached housing so that garages were always located immediately adjacent to each other, they would have said so in an ordinance. To the contrary, the City Council has stated in numerous ordinances its support of diversity in architectural design, and the intent to minimize the dominance of front yards by paving and parking for cars. These policies are imbedded into the ordinances which the City Council has passed. They are the means by which building design is properly incorporated into the clear and objective standards which regulate the development of needed housing. **There is no ordinance** requiring that the garages in attached dwelling units be located immediately adjacent to each other.

## Number of Driveways Allowed – Clear and Objective Standards and Conditions Required

The parking space requirements for houses and duplexes are one per unit. *PCC Table 266-2, Standard A.* The required parking spaces in Valhalla's project are in garages. Those garages are located on the outside walls of the building. The building design has been approved by Planning and Zoning.

EXHIBIT C

Pursuant to PCC 17.28.100, "'Driveway' means a paved way for vehicular traffic extending from the roadway to the property line across a sidewalk, whether or not such sidewalk is improved, for the purpose of providing access to parking or maneuvering space on abutting property.' Valhalla is entitled to access to its parking and maneuvering spaces.

PCC 17.28.110.C.1 provides that, "More than one driveway may be allowed for frontage up to 100 feet with the approval from the Director of the Bureau of Transportation and the City Traffic Engineer."

Attached housing is required to have one parking space per unit. Therefore, in the case where those two units are located on one property, there are two distinct, individual (not shared) parking spaces on the property, each which require access to the road via a driveway. There is no ordinance which contains clear and objective standards which would provide a basis for not allowing the two driveways needed to access Valhalla's garages.

Valhalla's property is a standard city lot, on a standard city block, on a local service street, with no distinctive road conditions other than being a designated Neighborhood Greenway and lower traffic street. Other side-by-side attached housing on the block is serviced by two separate driveways. See, 4016 NE Rodney Avenue.

There is nothing in PCC 17.28.110.C.1 which provides any information as to what standards or conditions might be applied to a decision by the Director of the Bureau of Transportation and the City Traffic Engineer to grant or withhold approval for more than one driveway. Without pointing to any clear and objective standards that would provide a basis for withholding that approval, so long as the clear and objective standards which apply to a single driveway are met, there are no clear and objective standards upon which to withhold approval for more than one driveway.

The only clear and objective standards which exist on the face of an ordinance relative to driveways for two side-by-side, attached dwelling units are:

(1)     the requirement for two parking spaces,

(2)     the minimum garage entrance setback,

(3)     the size of the parking space,

(4)     the minimum and maximum driveway widths,

(5)     the requirement that no portion of a driveway may be located closer than 25 feet from the corner of a lot where two streets intersect, and

(6)     the limits on the percent of land area between the front lot line and the front building line that may be paved or used for vehicle areas.

### PBOT Does Not Have Authority to Make Value Judgments About Needed Housing

PBOT does not have the authority to create standards and conditions for the preservation of on-street parking relative to needed housing. It may only apply clear and objective standards and conditions which are found on the face of an ordinance. Otherwise, the City of Portland is not complying with ORS 197.307(4.).

PBOT created DRP 6.03 after making the value judgment that setback requirements ought to be increased and design standards imposed on attached housing in order to mitigate the effects that increased density, via attached housing with on-site parking, has on the amount of on-street parking available. They did not do this on a site-specific basis. They determined it should apply to *all* attached housing across four zones.

A reading of PCC 17.28.110.C.1 which gives the Director of the Bureau of Transportation and the City Traffic Engineer discretion to make value judgments (as opposed to engineering judgments) about the use of more than one driveway is incompatible with ORS 197.307(4).

"'Needed housing' is not to be subjected to standards, conditions or procedures that involve subjective, value-laden analyses designed to balance or mitigate impacts of the development on (1) the property to be developed or (2) the adjoining properties or community. Such standards, conditions or procedures are not clear and objective and could have the effect "of discouraging needed housing through unreasonable cost or delay."' *Rogue Valley Assoc. of Realtors v. City of Ashland*, 35 Or LUBA 139 (1998).

PBOT  admits, in the Background section of DRP 6.03, that there is no ordinance limiting attached housing to one driveway per frontage. "Where on-site parking is provided with these developments, PBOT has observed that the series of driveways that serve the on-site parking result in most or all on-street parking opportunities being eliminated." PBOT issued those prior  driveway permits. PBOT does not claim to have previously overlooked some clear and objective standard on the face of an ordinance limiting attached housing to one driveway per frontage.

Frontage of up to 100 feet is measured by ownership. *PCC 17.28.110.* Valhalla's project at

4163 and 4175 NE Rodney Avenue is located on one lot which is 100 feet deep and has a frontage of 50 feet. DRP 6.03 references frontages by dwelling units.

PBOT does not state that it is *required* by ordinance to limit attached housing to one driveway per every two units, rather it states that it has *decided* to limit attached housing to one driveway per every two units and impose the other conditions (increased setbacks and housing design) that facilitate the new "shared driveway" policy.

If there is not an ordinance, which on its face, requires that attached housing be designed with the garages immediately adjacent to each other, the City cannot require that as a condition of approval for the development of needed housing.

If there is not an ordinance, which on its face, amends the current zoning code to require a minimum garage setback of 24 feet instead of 18 feet, the City cannot require the additional setback as a condition of approval for the development of needed housing.

If there is not an ordinance, which on its face, requires the preservation of on-street parking in front of the property on which the needed housing is proposed, the City cannot require a shared driveway as a condition of approval for the development of needed housing.

**The City is Applying Standards and Criteria That do Not Comply with ORS 197.307(4)**

If the City Council does not stop PBOT from applying the standards and requirements of DRP 6.03 as conditions of approval for driveway permits, those improperly created standards and requirements *are* being applied as development standards for needed housing in violation of ORS 197.307(4).

In a case dealing with the question of which standards and criteria were in effect when a permit was granted, the Oregon Court of Appeals said, "We conclude that the term 'standards and criteria,' as used in ORS 227.178(3) and ORS 215.428(3), is not limited to the provisions that may be characterized as 'approval criteria' in a local comprehensive plan or land use regulation. . . .The statutes do not refer only to the local provisions that the local government **must apply** in acting on an application; it also includes provisions, . . ., that the government **does apply** and that have a meaningful impact on its decision." (**Emphasis added**.) *Davenport v. City of Tigard,* 121 Or. App. 135 (1993).

The City of Portland is imposing approval standards and conditions of approval on the issuance of development permits for needed housing that do not comply with ORS 197.307(4). The standards,

requirements and conditions that PBOT is imposing via DRP 6.03 are so significant that if allowed to remain in force the attached housing design which Valhalla had custom designed and engineered will not be permitted anywhere within the City of Portland, even though the design has been approved by Planning and Zoning. The standards which are clear and objective on the face of ordinances are being superceded by PBOT's rules. PBOT's rules clearly have a meaningful impact on the decision to grant a building permit given that no building permit is allowed until a driveway permit has been granted.

So long as PBOT is allowed to condition development permits upon compliance with standards, requirements and criteria that are not clear and objective on the face of an ordinance, the City of Portland will not be in compliance with the statewide planning goals, State statutes, the City's acknowledged comprehensive plan provisions or its own land use regulations.

### Complicity in a Consolidation of Power

PBOT's actions in creating and applying DRP 6.03 cannot be ignored or treated as anything less than policymaking far in excess of its authority. Because there is no ordinance requiring the preservation of on-street parking as a condition of approval for the development of needed housing, PBOT has no authority to make it a condition of approval for a driveway permit for needed housing. **This is a legislative act.**

The fact that no ordinance exists requiring the preservation of on-street parking for needed housing is confirmed by the authority cited for denial of Valhalla's driveway permit. It was not an ordinance. The denial which Valhalla received cited the basis for denial as, "Per Development Review Policy (DRP) 6.03, shared driveways are required with attached housing. . . . See below condition." The condition listed is, "The attached units shall share a 14-foot driveway per DRP 6.03." *Exhibit 4.* **This is an administrative enforcement act.**

After writing the rules in DRP 6.03 and instructing his staff to enforce the rules, the Development Review Division Manager wrote the rule making himself the judge of whether or not his rules conflict with any other statute, code, rule or ordinance. No appeal. *Exhibit 5.* **This is an adjudicatory act.**

### No Delegation to PBOT of the Authority Claimed by PBOT

In creating DRP 6.03, and requiring compliance with its standards as a condition of approval for a driveway permit, PBOT has exerted power beyond that delegated to it by the City Council.

"The test for determining whether a particular enactment is an unlawful delegation of legislative authority or a lawful delegation of fact finding power is whether the enactment is complete when it leaves the legislative halls. A legislative enactment is complete if it contains a full expression of legislative policy and sufficient procedural safeguards to protect against arbitrary application." *City of Damascus v. Brown*, 266 Or App 416 (2014).

PBOT claims its power to create and apply the standards in DRP 6.03 as conditions of approval comes from PCC 17.28.110.C.5.

As stated earlier, if PCC 17.28.110.C.5 is interpreted as giving PBOT discretion to make a policy judgment as to if, when, where and how on-street parking is required to be preserved, PCC 17.28.110.C.5 is not clear and objective and cannot be applied to regulate the development of needed housing.

## No Safeguards Against Arbitrary Application

Additionally, there are no safeguards to protect against arbitrary application. While there are three Public Works Appeals, none of them are available to an applicant denied a driveway permit on the basis of number or width or location of driveways.

"Examples of requirements not subject to a Public Works Alternative Review are changes in materials, thickness of materials, number of driveways, driveway location or width, and pavement sections." *Instructions for Public Works Alternative Review.*

"Examples of requirements not subject to a Public Works Administrative Appeal are changes in materials, thickness or materials, number of driveways, driveway location or width, and cross sections." *Instructions for Public Works Appeal.*

"The following actions are NOT subject to appeal: approval or denial of requests for design exceptions; . . ." *Public Works Panel and Board Appeals Process.* A request for more than one driveway is processed via a design exception request. A request to avoid the shared driveway requirement of DRP 6.03 is processed through a design exception request.

"Shared driveways are required with attached housing . . . Any variance from these standards requires formal review and approval by PBOT through a Driveway Design Exception request." *DRP 6.03.*

"DRP's may contain guidance regarding whether the policy/regulation can be modified or

appealed (i.e. Design Exception Request). This is the only means by which an applicant may seek to modify a specific requirement identified in the DRP. There is no appeal for the DRP itself." *Development Review Policy Manual (DRPM). Exhibit 5.*

"If any DRP is found to be in conflict with a statute, code, rule, or ordinance, the requirements of said *formally adopted/approved* regulation shall be controlling. Applicants may challenge that a DRP is in conflict with an existing regulation through submittal of an analysis documenting said conflict to the Development Review Division Manager. The Development Review Division Manager shall issue a finding whether a DRP is in conflict with an existing regulation. The Development Review Division Manager's finding is final and may not be appealed." *Development Review Policy Manual (DRPM).*

It seems obvious that having the author of the DRPs (the Development Review Division Manager) act as the sole and final arbiter of a dispute as to whether a given DRP is in conflict with a statute, code, rule, or ordinance provides little or no safeguard against arbitrary application. This is especially true given that the Development Review Division Manager is not a lawyer.

It should be noted that the appeal options identified by PBOT staff and the Sr. Deputy City Attorney were the first three described above, all of which were not applicable. As a procedure, the appeal process cannot be "clear and objective" if even the staff and Sr. Deputy City Attorney are confused as to if the process applies.

The appeal to the Development Review Division Manager was not mentioned, most likely because (after lengthy discussions with Valhalla's General Counsel) the Sr. Deputy City Attorney had already conferred with the Development Review Division Manager and they had reached the conclusion that DRP 6.03 did not conflict with any existing regulation. *Exhibit 4.*

**Lack of Any Meaningful Appeal Causes Unreasonable Cost and Delay**

With no meaningful appeal process available, there was no way to avoid unreasonable delay. There were no quick fixes. Valhalla could surrender and scrap the custom designed plans and start over (DRP 6.03's requirements would render the plans useless anywhere in Portland), which would mean having completely new designs drawn (a months long process) followed by new site plans, new engineering, new everything. This would also add unreasonable cost. The second option was to try to get someone at the City to listen when there isn't an appeal process. More than four months later, all of Valhalla's efforts in that regard have failed.

The City's failure to apply only clear and objective standards, conditions and procedures regulating the development of housing has created unreasonable cost and delay for Valhalla.

EXHIBIT C

### Legislative Requirements Cannot Be Avoided by Back Channel Rulemaking

If the City Council wanted to change the zoning code to increase the garage entrance setbacks for attached housing in the R3, R2, R1, and R2.5 zones it would follow a strict, mandatory process to do so.

If the City Council wanted to require shared driveways for all attached housing in the R3, R2, R1, and R2.5 zones it would follow a strict, mandatory process to enact an ordinance requiring the same.

If the City Council wanted to impose additional design restrictions on attached housing to require that garages be located immediately adjacent to each other, it would follow a strict, mandatory process to enact an ordinance requiring the same.

Among those strict, mandatory processes would be:

1. Sending written notice at least 20 days but not more than 40 days before the date of the first hearing to owners of property that the new ordinance proposes to rezone.

2. Submitting the proposed change to the Director of the Department of Land Conservation and Development . . . at least 20 days before the local government holds the first evidentiary hearing on adoption of the proposed change.

3. Holding public hearings on the proposals.

4. Voting in public on the proposals.

5. Submitting the newly adopted ordinances to the Director of the Department of Land Conservation and Development who will provide notice of appeal rights to the appropriate persons.

**There is simply no plausible argument that all of the foregoing requirements can be avoided by having the same changes made via an internal memorandum by the City Traffic Engineer and the Development Review Division Manager at PBOT.**

### Procedural Requirements Are Meant to Improve the Outcome

The foregoing procedural requirements do more than just protect property owners from

EXHIBIT C

surprise, they present an opportunity for input which can improve the legislation itself. Oregon Statewide Planning Goal 1: Citizen Involvement, OAR 660-015-0000(1), requires that citizens have the opportunity to be involved in all phases of the planning process including minor changes and major revisions to the implementation measures.

The work of the City Council and numerous committees, citizen groups and interested parties in weighing, analyzing and attempting to balance competing uses for the curb zone, diversity in housing, and the myriad of factors that must be considered in arriving at decisions about land use regulations is disrespected (and Goal 1 eviscerated) if an internal memorandum can be used to the same effect. Not only is DRP 6.03 invalid because of the way in which it came into existence, but it does not represent a good solution.

As DRP 6.03 itself admits, all of this negative restriction on housing design and front yard setbacks and appearance is designed just to create "compact car" parking spaces along the curb of 15 feet.

The fact is that a 15 foot parking space will do very little to provide on-street parking. Given that 91.40% of the top forty cars sold in the U.S. over the past four years are longer than 15 feet and that of the 8.60% that are under 15 feet long, the average length is 14 feet six inches, the claim that 15 feet is a parking space makes no sense. Ten out of eleven cars on the road cannot park in a 15 foot long space. Even fewer cars can park in the space when you take into consideration the maneuvering space necessary to parallel park. According to the PCC's own standards, a parallel parking space requires, at a minimum, 22 ½ feet.

The reality is that a 50 foot long frontage that houses a single family home with a driveway will likely have one on-street parking space in front of the property. One family plus one on-street parking spot. A 50 foot long frontage that houses two family homes with driveways will not have an on-street parking space in front of the property. It seems like the City made a pretty good trade-off. If others disagree, there is a open process for considering alternatives.

Compliance with ORS 197.307(4) is not possible until DRP 6.03 is affirmatively repealed and the standards and requirements contained within barred from being imposed as conditions of approval for needed housing.

The solution is to take the actions requested on the first page of this letter. The damages which Valhalla has suffered as a result of this inappropriate action by PBOT are significant and continue to accrue and increase with each passing day. Issuance of the requested driveway permits with all due haste will mitigate those damages.

EXHIBIT C

Portland City Council
Portland City Attorney
April 13, 2018
Page 18 of 18

Respectfully submitted,

Mari Redman Ives, OSB 002893
General Counsel
Valhalla Custom Homes LLC
14210 SE Harney Street
Portland, Oregon 97236

mari@valhallacustomhomes.com
503-349-7879

Enclosures

## <u>CERTIFICATE OF SERVICE</u>

1                I hereby certify that I served a copy of the foregoing **DECLARATION OF**

2    **MARI REDMAN IVES** on:

William Manlove, OSB #891607          ☐ U.S. Mail
Michael Jeter, OSB #165413           ☐ Facsimile
Portland Office of the City Attorney  ☐ Hand Delivery
1221 SW 4th Avenue, Room 430          ☐ Overnight Courier
Portland, OR 97204                   ☒ Email
william.manlove@portlandoregon.gov   ☒ Via CM/ECF E-Filing
michael.jeter@portlandoregon.gov
*Of Attorneys for Defendants*

DATED this 19th day of July 2021.


HATHAWAY LARSON LLP


By ____s/ Gregory S. Hathaway_____
    Gregory S. Hathaway, OSB #731240
    Email:  greg@hathawaylarson.com
    *Of Attorneys for Plaintiff*